**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| FANTA KOUDOUKARA,<br><br>*Plaintiff*,<br><br>v.<br><br>EMBASSY OF MALI,<br><br>*Defendant*, | Civil Action No. 24‑1900 (SLS)<br>Judge Sparkle L. Sooknanan |

**<u>MEMORANDUM OPINION</u>**

Fanta Koudoukara was employed as a secretary by the Embassy of Mali from September 2022 to July 2023. Ms. Koudoukara alleges that during her employment, the Ambassador of Mali repeatedly asked her to stay late to have sex. She further alleges that the Embassy fired her after she refused these invitations and reported the Ambassador to human resources. Following her termination, Ms. Koudoukara brought this action against the Embassy of Mali for sex discrimination and retaliation in violation of Title VII and the DC Human Rights Act (DCHRA) and for non-payment of wages in violation of the Fair Labor Standards Act (FLSA). Despite service, the Embassy has not responded to the Complaint or otherwise appeared in this action. Ms. Koudoukara now moves for default judgment. For the reasons below, the Court grants default judgment in part and finds the Embassy of Mali liable on the Title VII and DCHRA claims. But the Court denies default judgment on the FLSA claim. And because Ms. Koudoukara has not provided enough information for the Court to assess damages, the Court may not do so at this time.

## BACKGROUND

### A.    Factual Background

The Court draws the facts from "uncontroverted factual allegations that are supported by affidavits" in the record. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015).

Ms. Koudoukara was employed as a secretary by the Embassy of Mali from September 2022 to July 2023. Koudoukara Aff. ¶ 3, ECF No. 14-3. According to Ms. Koudoukara, in May 2023, the head of the Embassy, Ambassador Sekou Berthe, instructed her that: "I need you to stay after 5pm because I want you." *Id.* ¶ 5. Ms. Koudoukara understood this to be an invitation to engage in sexual intercourse, as the Ambassador had initiated sexual relations with other female staff at the Embassy with similar invitations. *Id.* Male employees were not subject to similar invitations by the Ambassador. *Id.* ¶ 11.

Ms. Koudoukara reported this incident to a human resources officer at the Embassy, stating that he "need[ed] to tell the Ambassador to stop harassing [Ms. Koudoukara] because this [invitation] [wa]s sexual harassment, and that [Ms. Koudoukara was] [t]here to work and not have sex with the Ambassador." *Id.* ¶ 7. The human resources officer responded that he would "talk to the Ambassador," but noted that "[the Ambassador] is the boss in here." *Id.* Ms. Koudoukara responded: "what does that mean? Does that mean that he can have sex with me?" *Id.* To which the human resources officer said, "No." *Id.*

Notwithstanding this interaction with human resources, Ms. Koudoukara reports that between May 2023 to July 2023, the Ambassador repeatedly encouraged her to stay late and explicitly made clear that he "want[ed] to sleep with [her]." *Id.* ¶ 8. Each time, Ms. Koudoukara refused and continued to report the incidents to human resources. *Id.* ¶ 10. Yet human resources never acted on her complaints. *Id.* Instead, on July 6, 2023, the Ambassador provided Ms. Koudoukara with a 15-day notice of termination, which she alleges was "because [she]

2

refuse[d] to stay after 5 so [they] c[ould] have sex!" *Id.* ¶ 12. In July 2023, the Embassy terminated Ms. Koudoukara and did not pay her wages for a month of her employment. *Id.* ¶¶ 17–18.

### B.      Procedural Background

In June 2024, Ms. Koudoukara brought this action against the Embassy of Mali for sex discrimination and retaliation in violation of Title VII and the DCHRA and for non-payment of wages in violation of the FLSA. Compl., ECF No. 1. Despite service, the Embassy has not responded to the Complaint or otherwise appeared in this action. On February 18, 2025, the Clerk of the Court entered default against the Embassy. Clerk's Entry of Default, ECF No. 12. Ms. Koudoukara now moves for default judgment. Pl.'s Mem. Supp. Default J. (Mot.), ECF No. 14-1. After the entry of default, the Court invited the United States to present its views on this case due to its implications for foreign relations. Min. Order (Jan. 12, 2026). The United States submitted a statement of interest, expressing its view that this action is governed by the Foreign Sovereign Immunities Act (FSIA) but not taking any position on the case's merits. U.S. Statement of Interest, ECF No. 17. Ms. Koudoukara has submitted supplemental memoranda in response to the issues raised by the United States. *See* Pl.'s Suppl. Mem., ECF No. 18; Pl.'s Notice, ECF No. 19. The issues are briefed and ripe for review.

### LEGAL STANDARD

Federal Rule of Civil Procedure 55 provides for "default judgments, which safeguard plaintiffs when the adversary process has been halted because of an essentially unresponsive party." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (cleaned up). But an entry of default judgment is not automatic, and it is not a decision that courts make lightly. *See Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980) ("Default judgments are not favored by modern courts, perhaps because it seems inherently unfair to use the court's power to enter and enforce judgments as a penalty for delays in filing.").

Where a plaintiff seeks default judgment in a case implicating the FSIA, the plaintiff must "establish[ ] . . . [its] right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This "imposes a duty on [the] court[ ] to not simply accept a complaint's unsupported allegations as true, and obligates courts to inquire further before entering judgment[.]" *Firebird Glob. Master Fund II Ltd. v. Republic of Nauru*, 915 F. Supp. 2d 124, 126 (D.D.C. 2013) (internal quotation marks omitted). A court retains an affirmative obligation to ensure that it has "subject-matter jurisdiction over the claims, personal jurisdiction over the absent parties, and that the plaintiff has established its right to relief under federal or state law." *Omni Bridgeway Ltd. v. Ministry of Infrastructure & Energy of the Republic of Albania*, No. 23-cv-1938, 2025 WL 506570, at *4 (D.D.C. Feb. 14, 2025) (quoting *Mwani*, 417 F.3d at 6).

Nevertheless, on default judgment, a court may "accept as true the plaintiff's uncontroverted evidence." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000). An evidentiary hearing is not required; proof may be established by affidavit. *See Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 16–17 (D.D.C. 2016); *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012). In addition, a court may "take judicial notice of related proceedings and records in cases before the same court." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 43 (D.D.C. 2008) (quoting *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 272 (D.D.C. 2007)).

## DISCUSSION

The Court is satisfied that it has subject-matter jurisdiction over the claims, that it has personal jurisdiction over the Parties, and that Ms. Koudoukara has established the Embassy's liability under Title VII and the DCHRA. But Ms. Koudoukara has not established liability under the FLSA or proven an entitlement to damages. Accordingly, the Court grants in part and denies

4

in part her Motion for Default Judgment. ECF No. 14. The Court instructs Ms. Koudoukara to file any supplemental submissions in support of her claimed damages by June 20, 2026.

### A.    Rule 55 Requirements

At the threshold, a plaintiff seeking default judgment must: (1) request that the Clerk of the Court enter default based on the defendant's failure to respond and (2) file a motion for default judgment. *See Omni Bridgeway*, 2025 WL 506570, at *3; Fed. R. Civ. P. 55. Ms. Koudoukara has completed these steps, *see* Mot. Entry Default, ECF No. 10; Clerk's Entry of Default, ECF No. 12; Mot. Default J., ECF No. 14, so this requirement is satisfied.

### B.    Subject-Matter Jurisdiction

Starting with subject-matter jurisdiction, the FSIA serves as "the sole basis for obtaining jurisdiction over a foreign state in our courts." *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 605 U.S. 223, 229 (2025) (citation omitted). The FSIA grants district courts subject-matter jurisdiction over (1) "any nonjury civil action" (2) "against a foreign state" (3) for "any claim for relief in personam," but only if (4) the state "is not entitled to immunity." 28 U.S.C. § 1330(a). All of these requirements are satisfied in this case.

*First*, it is true that the Complaint includes a jury demand. Compl. 1:11. But "all federal appellate courts which have considered the issue have held that jury trials are not available in suits brought under the FSIA." *Saberi v. Gov't of Islamic Republic of Iran*, 541 F. Supp. 3d 67, 77 (D.D.C. 2021) (cleaned up) (quoting *Universal Consol. Cos. v. Bank of China*, 35 F.3d 243, 245 (6th Cir. 1994)). "Congress was careful to maintain the international standard that a foreign state shall not be subject to a jury trial." *Rishikof v. Mortada*, 70 F. Supp. 3d 8, 16 (D.D.C. 2014). But instead of dismissing claims against a foreign sovereign that contain a jury demand, the more "sensible practice is simply to strike the jury demand." *Houston v. Murmansk Shipping Co.*, 667

F.2d 1151, 1154 (4th Cir. 1982) (collecting cases). Accordingly, the Court strikes Ms. Koudoukara's jury demand, Compl. 1:11, making "this action . . . a 'nonjury civil action,'" *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017).

*Second*, this suit is brought against the Embassy of Mali, which is a foreign state as that term is understood in the FSIA. *See infra* Discussion C.

*Third*, the suit is brought against the Embassy personally and not its property—a claim for *in personam* relief. *See Est. of Majd Kamalmaz v. Syrian Arab Republic*, No. 24-cv-2136, 2026 WL 1159653, at *4 (D.D.C. Feb. 24, 2026).

*Fourth*, although foreign states are normally "immune from the jurisdiction" of federal courts, 28 U.S.C. § 1604, the FSIA provides an exception where a "foreign state has waived its immunity . . . by implication," *id.* § 1605(a)(1). And "[w]henever an FSIA immunity exception applies, jurisdiction usually follows." *Antrix*, 605 U.S. at 230. A foreign state impliedly waives immunity when it "at some point indicate[s] its amenability to suit." *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994). But "mechanistic application of the implied waiver [exception] . . . would be inconsistent with the notions of 'grace and comity' that underlie" foreign sovereign immunity. *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 445 (D.C. Cir. 1990) (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983)). Courts thus "constru[e] the implied waiver provision narrowly" and require "strong evidence that [waiver] is what the foreign state intended." *Khochinsky v. Republic of Poland*, 1 F.4th 1, 8 (D.C. Cir. 2021) (cleaned up). The standard is met when a foreign sovereign "execut[es] a contract containing a choice-of-law clause designating the laws of the United States as applicable." *TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221, 236 (D.C. Cir. 2024) (quoting *Khochinsky*, 1 F.4th at 8).

6

Here, Ms. Koudoukara's employment contract with the Embassy explicitly "refers to [] US labor law" as governing it. Emp. Contract, art. 12 (Eric Goze trans.), ECF No. 19-1. And the inclusion of such a choice-of-law provision in an employment "contract [that] is to be implemented locally" is an implied waiver of immunity. *Ashraf-Hassan v. Embassy of France in the United States*, 40 F. Supp. 3d 94, 100 (D.D.C. 2014), *aff'd* 610 F. App'x 3 (D.C. Cir. 2015). Thus, the Embassy of Mali has "assumed obligations to abide by U.S. law—including Title VII" and may be subject to suit in United States courts for cases arising out of its "employment relationship" with Ms. Koudoukara. *Id.* at 101 (citing *Ghawanmeh v. Islamic Saudi Acad.*, 672 F. Supp. 2d 3, 9–10 (D.D.C.  2009)). Consequently, because "an FSIA immunity exception applies," subject-matter "jurisdiction . . . follows" and the Court may entertain this suit against the Embassy. *Antrix*, 605 U.S. at 230.[1]

### C.      Personal Jurisdiction

Next, "personal jurisdiction over a foreign sovereign is 'automatic' whenever (1) 'an exception to immunity applies' and (2) 'service of process has been accomplished'" in the manner prescribed in the FSIA. *Antrix*, 605 U.S. at 232 (citation omitted) (characterizing 28 U.S.C. § 1330(b)). Put simply, "subject matter jurisdiction plus service of process equals personal jurisdiction." *Id.* at 233 (quoting *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir.

---

[1] Because the Court finds that the Embassy waived immunity in Ms. Koudoukara's employment contract, it need not address Ms. Koudoukara's alternative argument under the commercial activity exception of the FSIA, 28 U.S.C. § 1605(a)(2). Pl.'s Suppl. Mem. 1–2. In this Circuit, an employment relationship with an Embassy constitutes "commercial activity" when it is contractual, "administrative," in a "non-civil servant capacity," and does not involve "governmental decision-making." *Ashraf-Hassan v. Embassy of France*, 610 F. App'x 3, 5 (D.C. Cir. 2015) (citing *El–Hadad v. United Arab Emirates*, 216 F.3d 29, 33 (D.C. Cir. 2000)). And "the exception applies" so long as the employee's "claims are 'based upon' such employment." *Id.* (quoting *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1145 (D.C. Cir. 1994)).

2012)). Since Ms. Koudoukara has shown subject-matter jurisdiction, the only question remaining is whether "service has been made under [FSIA] section 1608[.]" 28 U.S.C. § 1330(b).

The FSIA establishes separate procedures to serve a "foreign state or political subdivision of a foreign state," 28 U.S.C. § 1608(a), as opposed to "an agency or instrumentality of a foreign state," *id.* § 1608(b). "[I]f the core functions of the entity are governmental," it must be served as a "foreign state" or political subdivision; if they are "commercial," then "the entity" must be served as "an agency or instrumentality of the foreign state." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) (citing *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 149–50 (D.C. Cir. 1994)). Because the Embassy of Mali's core functions are governmental, it must be served as a "foreign state or political subdivision" under Section 1608(a). *See Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27–29 (D.C. Cir. 2015).

Ms. Koudoukara incorrectly claims that service in this case is governed by Section 1608(b). *See* Mot. 4. But the Court nevertheless exercises personal jurisdiction over the Parties because Ms. Koudoukara has served the Embassy consistent with Section 1608(a). Specifically, the Clerk of the Court dispatched for mailing "one copy of the summons, complaint and notice of suit, together with a translation of each into the official language of the foreign state, by registered mail . . . to the head of the ministry of foreign affairs" of Mali "pursuant to the provisions of 28 U.S.C. § 1608(a)(3)." Certificate of Clerk, ECF No. 9. Ms. Koudoukara filed proof that this was delivered by registered mail to the Foreign Ministry of Mali in a packet addressed to the Foreign Minister Abdoulaye Diop. *See* ECF Nos. 6, 9-1, 10-1, 10-2, 10-3. And courts "assume that certified mail sent to a foreign minister will generally be signed for by a subordinate" who "has authority to receive mail on the minister's behalf and has been instructed on how that mail is to be handled." *Republic of Sudan v. Harrison*, 587 U.S. 1, 11 (2019). Thus, service is proper.

### D.    Liability

Turning to liability, Ms. Koudoukara seeks default judgment for her claims under Title VII, the DCHRA, and the FLSA. Mot. "Title VII and DCHRA claims are analyzed under the same legal standard." *Jbari v. District of Columbia*, 304 F. Supp. 3d 201, 208 n.9 (D.D.C. 2018) (citing *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999)). Thus, the Court examines the Title VII and DCHRA claims together "according to the standards of Title VII." *Gebretsadike v. District of Columbia*, No. 23-cv-03198, 2024 WL 3291744, at *6 (D.D.C. July 3, 2024) (citing *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1246 (D.C. Cir. 2011)). Ms. Koudoukara's claims fall under three legal theories: (1) discrimination and sexual harassment in violation of Title VII and the DCHRA, (2) retaliation in violation of Title VII and the DCHRA, and (3) non-payment of wages in violation of the FLSA. She may recover on the first two theories but not the third.

### 1.    Discrimination and Sexual Harassment (Counts 1, 2, 5, 6, and 8)

Ms. Koudoukara brings claims for sex discrimination, sexual harassment, and quid-pro-quo sexual harassment against the Embassy. Mot. 6–14. Title VII makes it unlawful to discriminate against any person "based on sex." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986). And "[w]ithout question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Id.* at 64. So "[t]wo types of sexual harassment are actionable under Title VII: quid pro quo and hostile work environment." *Holbrook v. Reno*, 196 F.3d 255, 262 (D.C. Cir. 1999). Quid pro quo is "explicit"— it "occurs when an employer alters, or threatens to alter, an employee's job conditions as a result of the employee's refusal to submit to sexual demands." *Curry v. District of Columbia*, 195 F.3d 654, 659 (D.C. Cir. 1999); *Gary v. WMATA*, No. 90-3076, 1992 WL 714990, at *3 (D.D.C. Dec. 2, 1992). Meanwhile, a hostile work environment is "constructive"—it is established "when

harassing conduct at work is sufficiently pervasive so as to create an abusive working environment." *Curry*, 195 F.3d at 659; *Gary*, 1992 WL 714990, at \*3. Importantly, "these labels" merely describe "varying workplace conditions that violate Title VII's basic prohibition on sex discrimination in terms or conditions of employment." *Gregory v. Daly*, 243 F.3d 687, 698 (2d Cir. 2001) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751–52 (1998)). Thus, although Ms. Koudoukara brings her quid-pro-quo sexual harassment, sexual harassment, and sex discrimination claims as separate counts, the Court considers them together as a part of her "cause of action for discrimination on the basis of sex[.]" *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 182 (E.D.N.Y. 2012) (using this approach).

Here, Ms. Koudoukara has met her burden of establishing discrimination based on quid-pro-quo sexual harassment. Her claims are governed by the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To make out a prima facie case, she must show (1) "that she was a member of a protected class," (2) "that she was subjected to unwelcome sexual advances or requests for sexual favors," (3) "that the harassment complained of was based on sex," (4) "that the employee's submission to the unwelcome advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in an adverse job consequence," and (5) "that respondeat superior liability exists." *Norris v. WMATA*, 342 F. Supp. 3d 97, 121 (D.D.C. 2018).

Ms. Koudoukara has done just that. She has declared under penalty of perjury (1) that she is a female previously employed by the Embassy, (2) that her supervisor Ambassador Berthe repeatedly requested sexual favors from her, (3) that such sexual favors were sought from female employees but not male employees, and (4) that she was terminated due to her refusal to have sex

with the Ambassador. Koudoukara Aff. ¶¶ 2–6, 8–12. This is certainly enough to demonstrate the first four prongs of a prima facie claim. *See Norris*, 342 F. Supp. 3d at 121. Ms. Koudoukara further declared that she reported the Ambassador's concerning behavior to the Embassy's human resources, who took no action. Koudoukara Aff. ¶¶ 7, 10. And such "attempts to complain about her supervisor's harassing behavior, which were ignored," is more than enough to show respondeat superior liability for sexual harassment. *Chadwick v. District of Columbia*, 56 F. Supp. 2d 69, 71 (D.D.C. 1999). Thus, Ms. Koudoukara has made out a prima facie claim of quid pro quo sexual harassment.

Normally, "[i]f a plaintiff establishes a prima facie case of discrimination, '[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *Stanford v. Howard Univ.*, No. 23-cv-3041, 2025 WL 3062907, at *3 (D.D.C. Nov. 3, 2025) (quoting *McDonnell Douglas*, 411 U.S. at 802). But here, the Embassy defaulted and thus, failed to articulate any nondiscriminatory reason. *See Guerra v. Bros. Builders, LLC*, No. 23-cv-1291, 2025 WL 2709631, at *1 (D.D.C. Sep. 23, 2025). Thus, the Court grants default judgment against the Embassy on Ms. Koudoukara's sex discrimination claims under Title VII and the DCHRA.

### 2.    Retaliation (Counts 3 and 7)

Ms. Koudoukara also seeks default judgment on retaliation claims against the Embassy under Title VII and the DCHRA. Mot. 12. "To establish a claim for retaliation under Title VII, a plaintiff must 'plausibly allege that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action by [her] employer, and (3) the two are causally connected." *Brinkley v. District of Columbia*, No. 21-cv-1537, 2026 WL 850679, at *35 (D.D.C. Mar. 27, 2026) (quoting *Spence v. U.S. Dep't of Veterans Affs.*, 109 F.4th 531, 539 (D.C. Cir. 2024)).

11

Specifically, Title VII's antiretaliation provision makes it unlawful to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

There are two types of activity protected by the antiretaliation provision: participation and opposition. "The participation clause . . . protects an employee's actions in relation to official or legal Title VII proceedings." *Wang v. WMATA*, 206 F. Supp. 3d 46, 77 (D.D.C. 2016) (cleaned up). "The opposition clause protects a broad range of informal actions or statements that employees make in resistance to actions they reasonably perceive to be discriminatory." *Id.* at 76 (cleaned up). "When an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (cleaned up). "[T]he Supreme Court has made clear that 'ostensibly disapproving account[s] of sexually obnoxious behavior' are 'covered by the opposition clause' of Title VII's retaliation provision." *Tennant v. District of Columbia*, No. 19-cv-2949, 2020 WL 4464505, at *7 (D.D.C. Aug. 3, 2020) (alteration in original) (quoting *Crawford*, 555 U.S. at 276). Thus, "rebuffing unwanted sexual advances" constitutes protected activity under Title VII. *Dozier-Nix v. District of Columbia*, 851 F. Supp. 2d 163, 168 (D.D.C. 2012) (collecting cases).

Here, Ms. Koudoukara alleges (1) that she rebuffed the Ambassador's sexual advances and complained to him about his sexual harassment, and (2) that the Ambassador terminated her as a result. Koudoukara Aff. ¶¶ 6, 12. This showing is more than enough to demonstrate retaliation for

protected activity under Title VII and the DCHRA. *See Dozier-Nix*, 851 F. Supp. 2d at 168. So, the Court grants default judgment as to liability on these claims as well.

### 3.    FLSA (Count 9)

Finally, Ms. Koudoukara alleges that she is entitled to unpaid wages for the month of September 2022 under the FLSA. Mot. 14. But to raise a FLSA claim, Ms. Koudoukara must show that the Embassy is an enterprise with an "annual gross volume of sales made or business done [that] is not less than $500,000," or "that she engaged in commerce while working as [its] employee." *Astudillo v. Salon Macomb, LLC*, No. 24-cv-2294, 2025 WL 1568219, at *3 (D.D.C. June 3, 2025) (cleaned up) (citing 29 U.S.C. §§ 203(s)(1)(A)(ii), 206, 207). Instead, Ms. Koudoukara dedicates only four sentences of her motion to her FLSA claim, in which she does not address any of these threshold issues. Mot. 14. Accordingly, Ms. Koudoukara has failed to show a "right to relief" under the FLSA, and the Court denies default judgment on this claim. 28 U.S.C. § 1608(e).

### E.    Damages

In assessing a claim for default judgment, a "court is required to make an independent determination of the sum to be awarded unless the amount of damages is certain." *Walker v. Innovative Concept Sols. Int'l, Inc.*, 6 F. Supp. 3d 52, 54 (D.D.C. 2013) (cleaned up). And the "plaintiff must prove [her] damages to a reasonable certainty." *Guerra*, 2025 WL 2709631, at *1 (cleaned up). Ms. Koudoukara has not met this burden.

For instance, in support of her claim for back and front pay, Ms. Koudoukara declared under penalty of perjury that she earned annual wages of $41,000 or monthly wages of $3,416.67. Koudoukara Aff. ¶ 19. But the employment contract that she submitted contradicts this claim—showing her monthly salary as $2,370.93, with an additional month's salary awarded at

13

the end of the year based on availability of funds. Emp. Contract ¶¶ 1, 5. Further, although Ms. Koudoukara could earn overtime for working past 5pm, a core feature of her claim is that she refused to stay past 5pm. Koudoukara Aff. ¶¶ 3, 5, 6, 8. Thus, based on her sworn assertions and exhibits, Ms. Koudoukara earned at best $30,822.09 in wages annually, which is less than the $41,000 that Ms. Koudoukara claims. Since the record does not support Ms. Koudoukara's claim for front and back pay, the Court cannot grant it at this time.

Next, Ms. Koudoukara suggests that she is entitled to separate awards of $300,000 under Title VII and $700,000 under the DCHRA for her emotional distress. Proposed Order, ECF No. 14-2. But "[i]t is well settled that a party cannot recover the same damages twice, even though the recovery is based on two different theories." *Xereas v. Heiss*, 987 F.3d 1124, 1134 (D.C. Cir. 2021) (cleaned up). The fact that Title VII emotional distress damages are capped at $300,000 (but recovery under the DCHRA is not) does not change this result. *See* Mot. 14. To the extent Ms. Koudoukara's emotional distress exceeds $300,000, she must still show her right to a specific amount of emotional distress damages. Then, the Court can grant $300,000 dollars under both statutes and allocate any damages above the cap to the DCHRA alone. *See Jean-Baptiste v. District of Columbia*, 931 F. Supp. 2d 1, 15 (D.D.C. 2013). But Ms. Koudoukara's attempt at double recovery for the same harm is not permissible.

Finally, Ms. Koudoukara requests punitive damages for her Title VII and DCHRA claims. Mot. 14. But punitive damages are not available for these claims under the FSIA. *See* 28 U.S.C. § 1606 ("[A] foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages[.]"). Accordingly, the Court cannot grant these damages either.

In sum, the Court cannot determine damages on the current record. Accordingly, the Court instructs Ms. Koudoukara to file any supplemental submissions in support of her claimed damages by June 20, 2026. *See Walker*, 6 F. Supp. 3d at 56 (using this approach).[2]

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Motion for Default Judgment, ECF No. 14. The Court directs the Plaintiff to file any supplemental submissions in support of her claimed damages by June 20, 2026.

A separate order will issue.

_____

SPARKLE L. SOOKNANAN
United States District Judge

Date:   June 3, 2026

---

[2] Ms. Koudoukara also requests attorney fees and costs. Given that the Court is unable to determine damages at this time, it also declines to award attorney fees and costs. It will make that determination upon Ms. Koudoukara's submission of any supplemental memoranda.